Good morning, Your Honors. My name is Erin Tobin, appearing on behalf of Petitioners, Latino Issues Forum, Sierra Club, and Medical Advocates for Healthy Air. I'd like to reserve five minutes for a rebuttal. This case is about whether the San Joaquin Valley has attained the National Standard for Particulate Matter, or PM10. There is no dispute in this case that the valley's air is unhealthy to breathe. Between 2004 and 2006, the relevant time period in this case, monitors in the valley repeatedly recorded levels of PM10 pollution above the standard EPA has determined is safe. The central dispute in this case boils down to whether EPA can just ignore all of this pollution by calling it the result of exceptional high winds. In my argument, I'll address two overarching issues. First, whether EPA has met the statutory test for exceptional events, focusing on the September 22nd and the October 25th, 2006 exceedances. Second, I will address EPA's unlawful waiver of the nonattainment requirements for the valley based solely on its finding that the valley had temporarily attained the PM10 standard. I'd like to just cover a few brief background points to put this in perspective. The time period we are dealing with here is between 2004 and 2006. Now, we know that one monitor in Corcoran already recorded an exceedance of the standard on September 3rd, 2004. EPA never justified treating this particular exceedance as an exceptional event. Now, what this means is under EPA's regulations, this one day is treated as three separate exceedances for purposes of determining attainment. Now, for the valley, this means even one additional exceedance at the Corcoran monitoring site would prevent EPA from finding that the valley had attained. Now, the slew of exceedances that occurred in the fall 2006 changed everything. The September 22nd event was equivalent, because of the frequency of monitoring, was equivalent of six exceedances at the Bakersfield monitor and three exceedances at the Corcoran monitor. This would prevent EPA from finding that the valley had attained. Now, the October 25th event would also add an additional exceedance for both the Corcoran and Bakersfield monitors. Now, what this all means is that EPA had to justify ignoring all of the fall 2006 exceedances as being the result of exceptional events in order to find that the valley had attained. You have a pretty high burden to meet here when you're challenging the EPA's determination, do you not? Well, I understand that the standard of review here is the arbitrary and capricious standard of review, but we're dealing with a unique statute here. The Clean Air Act sets up a very specific definition of an exceptional event. It defines an exceptional event as one that affects air quality, is not reasonably controllable or preventable, and is one that is caused by human activity and likely to occur or a natural event. Now, Section 319 directs EPA that in order to ignore pollution as caused by an exceptional event, it has to show there's a clear causal relationship between the claimed exceptional event here when deroded dust and the measured exceedances at the monitoring site. So in order, under the arbitrary and capricious standard of review, EPA has to be able to demonstrate each one of these factors and to show that there's a clear relationship between the claimed event and the measured exceedances. Now, before getting into whether or not EPA has shown that the wind-deroded dust actually affected the monitors When you say it has to show, it has to determine. Correct. I agree with that. So it has no burden coming into our court. Well, I think one thing to keep in mind here, again, is that the Act sets up this requirement that there has to be not just any relationship between EPA's, you know, idea that there were high winds that caused dust to be picked up, and it has to show that there's a clear relationship between that idea and the measured exceedances. Now, the Act, Section 319, also directs EPA in implementing the exceptional events provision to provide public health protection the highest priority. What this means is it's not the second priority. It's not equal with other things. But what this means is that when there's a doubt about what may have happened, EPA needs to err on the side of protecting public health. And this is a very important part of the exceptional events requirement that Congress provided for. Now, one of the glaring problems here, Your Honors, is, you know, and I will get to the clear causal relationship in just a moment, but one of the glaring problems here is that EPA is trying to ignore pollution that could have been prevented. There's no dispute here that the district has identified numerous measures that could control or prevent wind erosion of the sort that EPA is saying is an exceptional event in this case. Now, the district admits that it made a conscious decision not to require that the largest source of PM10 pollution in the Valley, that would be agricultural sources, adopt any of these measures. It said when the district was faced with this decision, the district said we don't need to require that sources implement these measures because we don't believe the Valley has a windblown dust problem. Now, there's a fundamental disconnect here. On the one hand, the district and EPA are trying to say that the Valley doesn't have a windblown dust problem. On the other hand, the district has asked EPA to ignore multiple exceedances of the PM10 standard as caused by high winds. Well, you say multiples, and you open your argument that way, but we're only – how much can we deal with that when you're only attacking very specific instances, a couple of instances where – Well, again, I mean, just – I mean, you can say, well, there have been lots of others, but, I mean – Well, to put this in perspective, what EPA has done here is it's – we're not just talking about one or two exceedances of the standard. EPA is ignoring at the Bakersfield monitoring site, under EPA's regulations, the equivalent of 10 exceedances of the standard. On the days that you're talking about. Adding up the September 22nd and the October 25th exceedances, as well as the September 3rd, 2004 exceedance. See, I could understand – I don't know that it's absolutely logically inconsistent for somebody to say we don't have a general wind-blown dust problem, but we do have occasional times when very high winds cause dust. And, I mean, I'm not sure those are totally logically inconsistent. One is talking about a general condition, and the other is talking about an exceptional condition. But I think the record shows here that the district knows that there is a general problem. It may be sporadic and frequent PM10 pollution problems just in this time of year, but the district knows about this problem. The district knows that this can happen and does happen repeatedly in the fall months. Well, that's an assault, I suppose, I guess, then, on whether it's exceptional. Right, that's correct. But it also goes to whether or not EPA can find that these events were not reasonably controllable or preventable, because, again, there is no requirement that any of the agricultural sources in the Valley adopt measures that the record shows could control and prevent this pollution. Now, at the end of the day, Congress did not intend for EPA to use the exceptional events rule to ignore pollution that could be prevented or controlled. That's just not what Section 319 requires. Now, the second issue I'd like to address. Could I just ask you before you leave this? Yes. I'm flailing around a bit for some authority that bears on how one looks at exceptional circumstances and views the EPA. Can you help me with any cases? Well, so any cases constraining the exceptional events rule is fairly new. So I actually don't have any cases actually construing that I'm aware of right now constraining the exceptional events rule. I mean, with respect to the reasonably controllable or preventable issue, EPA did explain in the preamble to the exceptional events rule, and I'll quote from it, but it did explain that pollution caused by wind-eroded dust would be treated as an uncontrollable natural event. And I'm quoting now, when the dust originated from anthropogenic sources within the state that are determined to have been reasonably well controlled at the time the event occurred. So obviously EPA recognizes that it needs to look at what sources of PM10 pollution in the Valley are actually doing in order to make a finding that this exceptional event was not reasonably controllable or preventable. Now, moving on to the second issue I'd like to highlight, which is the clear causal relationship issue. Section 319, again, requires that EPA show that there's a clear causal relationship between the claimed exceptional event, in this case wind-eroded dust, and the measured exceedances at the monitoring site. Now, EPA's failure to meet this requirement is most profound with respect to the Bakersfield exceedances, which the record shows were not even affected by winds coming from the central San Joaquin Valley, as EPA suggests. The Bakersfield monitors were actually impacted from winds coming from a totally different direction, from south and southwest of the city. Now, EPA's whole theory here, which keep in mind, petitioners dispute at every single step, but EPA's theory, again, is that high winds in the central San Joaquin Valley picked up dust from agricultural sources and other sources of particulate matter, lifted the dust high up into the air, and then transported that dust 50 or 60 miles south towards the monitor in Bakersfield. Now, even accepting all of these steps as true, if the court believes this, EPA fundamentally has not shown the last part of this, which is, how did the pollution ever actually affect the monitors which are at ground level? Now, EPA relies in part on what are called high-split models. These are models that simulate wind trajectories. They show where either wind particles go or where they've come from. All EPA's models show is that winds high above Lemoore were traveling, may have reached Bakersfield 50 or 60 miles away. They don't show, again, how pollution either made it up to that elevation or how pollution would have ever affected the monitors at ground level. Now, again, the record shows that other models simulating wind trajectories that actually affected the Bakersfield monitor did not actually come from that region. They came from southwest of Bakersfield and were coming at a very slow speed. Now, there's no dispute that the winds around Bakersfield were not of the sort that could have caused the wind erosion that EPA is saying is an exceptional event. Now, this is not a battle of the experts, as EPA would like the Court to believe. What this is about is EPA only telling a part of the story and failing to deal with the most important question here, which is, how did the pollution actually affect the monitors at ground level? Section 319 requires more than this. It's somewhere in the valley. EPA has to be able to show that the pollution actually affected the monitors. Now, the last issue – How would it normally do that? What are you suggesting they do? Now, you're saying the winds were simply in the wrong direction, I guess. But if the winds are in the right direction, how do they go about other than by seeing that it does cause – you know, the monitor does go up. I mean, how do they track actual pollution coming down and hitting the monitor? I mean, what we're talking about here is just – it would be studies showing how does pollution – how does wind particles, dust particles, how does that behave? How long would it take for those dust particles to be lifted up? How much wind would it require to actually get those wind particles high up into the air? And then how would those particles – why would they suddenly drop out of the sky 1,000 feet and impact the monitors at ground level? Studies could show this, but it will require some explanation from EPA, which just isn't in the record here. Now, the last issue, if there are no other questions related to that issue, the last issue I'd like to discuss is EPA's decision to waive the nonattainment requirements for the valley based solely on its finding that the valley had temporarily attained the PM10 standard. This issue turns entirely on Section 189 of the Act. Section 189 states that serious PM10 nonattainment area plans, and I'm quoting from the statute now, shall contain quantitative milestones which are to be achieved every three years until the area is re-designated attainment and which demonstrate reasonable further progress. Now, there's no dispute that EPA waived the nonattainment requirements for the valley, including the requirement to continue to demonstrate reasonable further progress in reducing emissions, as well as contingency measures which are intended to kick in automatically if an area fails to demonstrate reasonable further progress before it re-designated the valley. Now, we know this because the process for re-designation requires that EPA make a number of findings in addition to an attainment finding. Now, one of these findings is very critical here. It's a finding that improvements in air quality are the result of permanent and enforceable emissions reductions. There's no dispute EPA did not make these findings. This should be the end of the issue under Section 189. Chevron makes clear that if a statute is clear, that is the law. Section 189 is absolutely clear. We shouldn't even really be discussing this any further. Now, EPA tries to get around the clear import of Section 189 by offering what are essentially policy arguments. EPA argues that it doesn't think that Section 189 makes sense, but precedents of numerous courts recognize that whatever EPA thinks might be better policy cannot overcome this clear statutory text, and Section 189 is absolutely clear. Can I just ask one question? Most of the San Joaquin Valley is in the eastern district of California. Is this case, this, we're in a, this all is pursuant to a district court. No, this is not pursuant to a district court. This is independent of the district court completely? Yes, there is no district court proceeding in this case. This is on direct review from EPA. I understand that. Okay. But I thought that some of the requirements that were to be met had been established by a district court proceeding. There had been a district court proceeding directed at getting EPA to approve contingency measures. That was resolved at the district court level. Okay. Thank you. Okay. I'll reserve the rest for rebuttal. Thank you. Thank you. Good morning, Your Honor. I'm Dave Carson on behalf of EPA and Mr. Jay from the Air District, and I have agreed that I'll take 15 minutes and he'll take five, so I'll do my best to sit down when the yellow light comes on. There are two issues here before the court. One is whether the record supports EPA's determination that the valley has attained the PM10 standard, and wrapped up in that issue are the exceptional events issue and the Santa Rosa Rancheria issue that's all addressed in the briefs. And the second issue is whether EPA has reasonably interpreted those ambiguous provisions of the Clean Air Act that are geared solely towards attainment of the standard as not applying for as long as the valley has attained the standard. And there, EPA has not waived anything. It's just said that those requirements no longer apply for as long as the valley is attaining the standard. There's a lot of ground to cover in this case. I certainly am not going to cover it all. I'm going to try not to repeat much of what's in our briefs. I do want to explain a couple of key differences in the monitors in the case. I then want to focus on some of the data. And then I want to go over a couple of the points regarding the exceptional events criteria, including the reasonably well-controlled criteria, the excess of normal fluctuations criteria, based upon some arguments made in the reply briefs, and then turn to the clean data. In the two or three years before the ruling that they achieved attainment, how many exceedances were disregarded as exceptional? Well, the determination was based upon data from 2003 to 2005. There was the one 2004 exceedance where EPA had agreed that it should be flagged as an exceptional event. In this case, as EPA explained in its final rule, that didn't really matter, because when you look at the rest of the data, they were still attaining the standard. Right. I understand that. So then you have the September 22nd and October 25th high-wind events that have been challenged. I got the impression from the other argument that there had been numbers of other exceedances that somehow were. That's not the case, Your Honor. The only ones that were. I'm not saying that I was intentionally misled. It's just an impression I drew from the. I can see how you would have that impression, Your Honor. But in reality, the only exceptions are there was the 2004 one I mentioned, the September 22nd, the October 25th. Then there was one in December of 2006 that the petitioners did not challenge as a high-wind event. Okay. Can I ask you, do these monitors continue to monitor the air in the sand looking down? Well, that's the thing I was going to turn to next is the difference in the monitors. There are different kinds of monitors. There's one type of monitor that records PM10 on a one-in-six-day schedule. There's another type of monitor that is, in fact, a continuous monitor. So every day that it's in operation, if it's not down for some maintenance or some purpose, then it is continuously monitoring the air. At Corcoran, you have two of the one-in-six days, so effectively one in three days. You have one of the continuous. Santa Rosa Rancheria has only one of the one-in-six day. And Oildale has only one of the one-in-six day. Bakersfield has one of the one-in-six day and one continuous. So the only two continuous monitors are at Corcoran and Bakersfield. The rest are all one-in-six day. And effectively what happens if an exceedance is tripped at one of the one-in-six days, it is counted as six days of exceedance. That does not mean, of course, that there were actually six days of exceedances. It just means that that's how it's counted because it's only operating one of the six days. Because it's only operating one of the six days. On the continuous ones, it's only one day, of course. So are they going to continue monitoring? Yes, they will continue to monitoring as part of their maintenance plan. Giving data? Yes. So conceivably this area could fall out of compliance? It is possible, however. One thing I would like to point out is, as mentioned in Petitioner's reply brief, EPA has now redesignated the valley to attainment status. And so for that reason, the valley now has a maintenance plan, which has the measures which requires it to stay in compliance. And there's another whole regulatory regime that exists there and totally different contingency measures from those that would have applied before. So we're really in a different situation now than what was in the situation, for instance, when we filed our brief. I'd like to turn very quickly to some of the data. Oh, and before, by the way, on the monitors, the monitors are not at ground level. The one at Bakersfield is about 10 meters in the air. And that's also true of the one at Corcoran, the one at Santa Rosa Rancheria. The one at Oildale is primarily an ozone monitor. It's closer to the ground. With respect to the data, EPA primarily based its decision here. In fact, it did base its decision on the data. And I'd like to focus the Court to two tables in the record. They're Tables 4 and 5. They're found at Petitioner's excerpts at page 13 and 14. They're actually from EPA's final rule in this case. It's 73 Federal Register 14699. If you look at Tables 4 and 5, you'll see that Table 4 deals with September 22, 2006. Table 5 deals with the October 25, 2006, event. And, for instance, Table 4 shows the wind speed and direction on that day at Lamora Allensworth and then the corresponding PM10 concentrations at Corcoran and Bakersfield. Table 5 shows the same thing for the October 25 event, except it has Bakersfield's Meadows instead of Allenspaw. You will see that, in fact, the wind direction was from the northwest to the southeast at all of those monitors on those days. I have no idea what Petitioners are talking about to suggest that the winds in Bakersfield were from the south. The data shows that the wind was blowing down the valley from the northwest to the southeast. Now, Lamora is about 20 miles north of Corcoran. Bakersfield is about 50 miles further south of Corcoran. The wind's blowing down the valley. And if you look at those tables, you'll see that the high PM10 readings at Corcoran occurred at approximately one hour after the winds, which at the earliest point when they were high, were at 21 to 22 miles per hour. So they're covering 20 miles at 21 to 22 miles per hour. And that's when the high concentration started. And one thing I'd point out is when you're looking at this data in the record, when you see the concentrations, it'll say a concentration for 6 a.m. of X, that's actually measuring the concentrations between 6 and 7 a.m. So it's that whole hour. It's not just what was recorded exactly at 6. The winds at Lamora picked up along the day on both days with significant gusts. And you'll see the concentrations continue to increase. The high readings at Bakersfield, if you look at those tables, occurred about 5 to 6 hours later. And if you look at the monitors in between, you'll see that the monitors that the wind was blowing at about 12 to 15 miles per hour. So it covered 50 miles at 12 to 15 miles per hour in about 5 to 6 hours. So the data in the record really closely correlate to the concentrations that you are seeing here. You've got winds blowing in the right direction at the right speed to blow this pollution down the valley and to record at these monitors. The Air District did a study in 2004 that showed that winds at 17.6 miles per hour are sufficient to entrain dust into the atmosphere. How often does that happen? That doesn't sound very fast to me. I don't doubt that it's enough to raise dust, but I don't think a 17-mile-an-hour wind is. Walking the streets of San Francisco, I guess. Well, Your Honor, in the record at page, Respondent's Excerpt to Record at page 115, it shows that the maximally winds in September are normally between 4 to 8 miles per hour in that Corcoran area, and that winds above 16 miles per hour are very rare in the Western Valley. So it is exceptional. And, again, this determination that the winds were sufficient to entrain the dust was not at all challenged by the petitioners here. And EPA determined that while the winds in between were not alone sufficient to entrain dust, that once it was kicked up into the air, they were certainly sufficient to carry that dust on down the valley. And petitioners would appear to require some kind of study, but I don't know how we're supposed to recreate these events. I mean, you know, they say, well, EPA should have done more, but, you know, what more should they have done? EPA's, you know, at one point petitioners in their papers said that these are common-sense judgments, and to some extent I agree with it, because if you go over the data I just mentioned, it is common sense. But I do believe that it's also scientific and technical determinations that should get deference from the court, and they were made by expert meteorologists and air pollution experts at EPA. Touching briefly on the high-split model, the high-split model was not used as a dispersion-type model. In other words, it wasn't used by anyone here to determine where did all this pollution fall. And keep in mind that on those days there weren't monitors running in between Corcoran and Bakersfield that would tell us where this pollution is falling out, so EPA had to make reasonable judgments here. And high-split was not used to determine that. High-split was used only as a trajectory model. It was only used to determine, all right, are the winds blowing in the right direction, and would they likely meet, you know, at this point over this period of time? And with appropriate inputs, as EPA used, the use of that model supports EPA's determination that, based upon the data, that these exceedances were caused by the exceptionally high winds. And as pointed out in our brief, the main difference between what EPA did and what Jan Knoll, which was Petitioner's expert, did is EPA used more comprehensive data. EPA looked at what's called the mixed layer, which is that area of air that's the most turbulent area of air of the atmosphere closest to the earth, and EPA modeled at the beginning, the middle, and the end of the mixed layer. And that's how it used the inputs that it used. What do we make, or should we make, of the agencies waiting until the last day to make the determination? I'm not sure I understand the question. Well, my understanding is when they determined attainment, it was one day before a court-ordered deadline to either find attainment or create an implementation plan? I believe it was, and I don't know that it was exactly where that fell, Your Honor. There was this district court proceeding, and the court had said that, you know, if you don't, you're under a court order, in other words, to propose these contingency measures, but if you determine that the area is in attainment, then you're no longer under that court order. But the court needs to keep in mind that even prior to that, EPA was in the process and had proposed to find the area in attainment. So that process was going on over this time period. The data that was used is the 2003 to 2005 data set. So EPA had been looking at that for some time, and frankly, they had to go through notice and comment rulemaking. These things take a while, so I wouldn't necessarily draw anything from that. Turning to the exceptional events criteria, and I can see I'm running quite low on time, but the one thing I'd like to point out there is, with respect to all these criteria, Congress directed EPA to come up with these regulations and to apply those regulations when it's making these determinations. And Petitioners seem to just suggest that EPA has to come in here and somehow tie all of its determinations to something in the statute. But, in fact, they cannot challenge the regulation here. And the one thing that Ms. Tobin mentioned about that protection of human health had to be the highest consideration, that's in the development of the regulations, and EPA did that in the development of the regulations. And they can't challenge that here. The only question here is whether EPA has reasonably applied its regulations, and, of course, EPA's interpretation of the regulations are entitled to change. Yeah, but you know, I know. I know. And I've looked at the data. But it's – I spent a good deal of time on the roof of the new courthouse in Fresno, and sometimes you couldn't see very well. I just wondered if there were references in the argument to measures with respect to agriculture, and I was just wondering if there's anything in this record that discusses other possible sources of pollution or specifically agriculture. Well, one thing to keep in mind, Your Honor, That doesn't necessarily mean that what you are seeing is PM10. Oh, I understand. I understand. I'm not sure – I don't recall places in the – since we've mainly focused on their argument about agriculture, I don't really recall what else in the record about other sources. But there certainly are other sources of PM10 pollution. And, in fact, you know, for instance, the Bakersfield monitor itself is in a – I mean, it's not really in an agricultural area. It's in an area that's more light industrial to commercial. And certainly, you know, just cars driving down the road, for instance, are going to kick up some dust that might be recorded at that monitor. In the very little brief time I have remaining, I would like to turn to the clean data issue. We've fully briefed the issue. This is – again, EPA hasn't waived anything. They've just determined that certain measures that are to get an area to attainment should not apply in between the time that the area has already gathered attainment but before they've been redesignated. Here, again, since this area has been redesignated, the court doesn't really need to reach that issue in this case because the whole purpose of that clean data policy is to cover the time in between attainment before you get your maintenance plan until you get redesignated. And so assuming you uphold us, EPA, on the exceptional events, there's really no need to reach that issue. And in fact, even if you overturned EPA on the exceptional events to the point where there would be non-attainment, then you wouldn't have to reach the issue either. So it's a different situation now than it was when we filed our brief. Your Honor, I see that I'm a little beyond my time, and I want to give Mr. Jay a fair chance. So thank you. And, again, we ask that the court uphold all of EPA's determinations in this case. Thank you. Good morning. May it please the Court, Philip Jay, District Counsel. I represent the Air Pollution District. The dialogue that the Court is hearing today illustrates precisely what Justice Schroeder said in the beginning. Basically what we have here is a variety of factual disputes on scientific evidence, which way the wind was blowing, how strong it was blowing, whether it was blowing strong enough, whether it was exceptional, et cetera. The record is very extensive and covers all of the issues. And while there could be some doubt or some disagreement between experts, the Court's job is to decide was EPA's action reasonable in deciding that the district should be excused from these two days because of exceptional events. The district does take issue with Petitioner's statement to the effect that these sources are uncontrolled and the district pretty much does nothing and creates this picture that you have all these farms where no one's doing anything and the dust is just blowing all over the place in the fall, et cetera, et cetera. The record in our brief shows that essentially what we have here is a success story. Back in the early 90s, there were 35 days of exceedances of the PM10 standard over the years due to the measures that the district has imposed on agriculture and on other sources of pollution in the valley. These exceedance days have dropped down dramatically over the years to the point now where we have maybe one or two days where we had some exceptional events. But for that, the district has a clean bill of health. So to give this impression that nothing is happening really is not an accurate description of what's going on in the valley. The farms that are subject to Rule 4550 are required to pick from a menu of options. If you were in, for example, an area where there was windblown dust, you would pick some of the options more tailored to windblown dust. They criticize the fact that that's kind of optional with the operator, I think, in their briefs, that they might choose an option that doesn't seem to be aimed at the problem that they have. Is there anything to it? Well, it's a problem the petitioners apparently have with the menu approach. And this circuit has upheld the use of that approach in a case that came out of Arizona, the Vigil v. Levitt case. The idea is you're dealing with an issue here where there's something like 25,000 square miles of territory. The district has over 9,000 acres of farms under these permits. And essentially it's such a diverse problem. Farms differ from farm to farm. Soil types are different. There's a wide variety of things going on out there. So the idea is let the experts, the people who actually run the farm, decide what to do. All of the measures in a lot of the categories in this menu deal with keeping dust down, things like watering roads, planting covering crops. The petitioners always mention putting up trees as barriers, et cetera. But you might not put up trees for barriers if you have an orchard. You might not water a road if it's got gravel or if it's paved. So the idea is to give the farmer flexibility to do that which is needed to keep the dust down on their particular farm. And the results, like I say, speak for themselves. Over the years, the district has had a tremendous reduction in levels of pollution and in the levels of days where it exceeds the standards. Is there a control then on the amount of pollution that a permittee can produce? And you leave it a method of controlling it to the permittee? It's essentially a collective issue. What the district did was said this source category, agriculture, has to reduce pollution by something like, I want to say it was something around 20 tons a day. And they said to do that, we're going to assume all these farmers use the least expensive control. And then doing that, calculations done show that those levels, those reductions are even, we've exceeded them. The target has been exceeded. So it's not each individual farm. It's all the farms as a whole were held responsible for one level of pollution. And I see I'm out of time. I appreciate the Court's consideration. Thank you. Thank you, Your Honors. I'd like to address a few of the issues raised by our opposing counsel. Now, first, considering the standard here, while we are reviewing EPA's determinations, under the Arbitrary and Capricious Standard of Review, under State Farm, EPA has to provide a rational explanation of how it came to its conclusions. Now, here, as far as the winds and the direction of the winds, EPA fails to explain and, again, fails to acknowledge that there is evidence in the record showing that the winds that actually affected the monitor at Bakersfield did not come from the north, as EPA claims. And I direct you to Petitioner's Excerpts of Record, page 127 and 133, where there are the model runs of the high-split model showing that the winds, again, did not come from that direction when they actually affected the monitor. Now, the second issue I'd like to address is the reasonably controllable or preventable issue. Agricultural sources, again, are the largest source of PM10 pollution in the Valley, and the District's rules, while they do outline a number of voluntary measures that sources could adopt to control windblown dust pollution, they don't require that sources adopt any of those measures. They're all completely voluntary. So sources could just decide not to do anything to control windblown dust pollution at all. Now, again, Section 319 requires that EPA be able to determine that an exceptional event was not reasonably controllable or preventable. Now, the last issue I'd like to address is the relevance of the re-designation to the Clean Data Policy issue. Just because EPA has now re-designated the Valley should not, you know, the government appears to be arguing that this moots our claim, and it doesn't. EPA should not be allowed to continue an illegal policy of waiving nonattainment requirements for PM10, serious PM10 nonattainment areas, based solely on a temporary attainment finding just because by the time it takes to litigate the issue, EPA has then made a finding, a decision to re-designate the area. Now, keep in mind, petitioners are challenging the re-designation decision, and part of that re-designation decision is based on whether or not this attainment finding is valid. So all of that is still very much up in the air, and obtaining a determination from this Court whether that policy is legal in this situation is very important and still very valid. Thank you, Your Honor. As I read the regulation, I think in defining an exceptional event, it's the event that's not reasonably controllable or preventable, and I suppose there's no way to control or prevent high wind. Absolutely, Your Honors. Now, we understand that high winds are weather. We can't control that. What we can control is the pollution that is created from the high winds, and here EPA's argument is that the exceptional event is not just high winds. It's high winds that are causing dust to be eroded from the ground, picking up dust from human sources of pollution, and causing that dust to be lifted up high and transported very far distances. I don't know if that violates the regulation. Well, the issue is, again, whether or not that event, the wind eroding, you know, the winds eroding the dust and causing that to be lifted up, whether that could be reasonably controllable or preventable. And in this case, there are many measures that the district has recognized could control and prevent that kind of pollution that are not required for the largest source of PM10 pollution in the Valley. This is a fundamental problem here. Section 319 does require more than that. Thank you. Thank you. The matter just argued is submitted for decision, and that concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Schroeder, Canby, Hawkins